[Cite as *In re G.A.*, 2025-Ohio-4536.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY

| | |
|---|---|
| In re G.A., M.A., N.A., B.R. | Court of Appeals No.   {86}WM-25-011 |
| | {86}WM-25-012 |
| | {86}WM-25-014 |
| | {86}WM-25-015 |
| | {86}WM-25-016 |
| | |
| | Trial Court No.    20233067 |
| | 20233065 |
| | 20233066 |
| | 20233068 |

**<u>DECISION AND JUDGMENT</u>**

Decided:  September 29, 2025

* * * * *

Rachael Sostoi, for appellee.

Tyler Naud Jechura, for appellant.

* * * * *

**MAYLE, J.**

**{¶ 1}** In these consolidated appeals, appellant, V.S. ("mother"), appeals the April 17, 2025  judgment of the Williams County Court of Common Pleas, Juvenile Division, terminating her parental rights and granting permanent custody of her four children, G.A. (D.O.B. 06/10/2022), M.A. (D.O.B. 08/09/2023), N.A. (D.O.B. 05/04/2021), and B.R. (D.O.B. 06/25/2020), to appellee, Williams County Department of Job and Family

Services ("the agency").  The trial court also terminated the parental rights of the children's fathers.[1]  For the following reasons, we affirm.

## I. Background and Facts

### A. Complaint and adjudication

{¶ 2}   On August 29, 2023, the agency received a report that mother was living out of her car and asking for money at a gas station.  In the report, mother had been at the station for three hours with the children who were dressed only in diapers.  The three oldest, B.R., N.A., and G.A., were briefly placed with mother's grandmother, E.M.  They were safety planned with E.M. after father D.A. showed up at E.M.'s home demanding to see the children even though he is a registered sex offender who cannot be around minor children, including his own.[2]  The youngest, M.A., had already been separated from her siblings at the time the report was filed and was living with a stranger, M.W.  Prior to the agency's involvement in the case, M.W. had answered a Facebook post from mother asking for assistance with then-two-week-old baby.  After the agency's involvement, M.A. was safety planned to remain with M.W.

{¶ 3}   On October 26, 2023, after roughly two months with E.M., the three oldest children were moved from their great-grandmother's home following allegations of

---

[1] D.A. is the father of G.A. and M.A., L.E. is the father of B.R., and M.S. is the father of N.A.  D.A. and L.E. are not parties to this appeal.  M.S. filed a notice of appeal in WM-25-011 on April 30, 2025, but never filed a brief as required by App.R. 18.  Therefore, pursuant to App.R. 18(C), this court ordered his appeal dismissed on August 28, 2025.

[2] *See State v. Austin*, Williams C.P., No. 15-CR-000076 (June 16, 2015).

2.

sexual abuse.  E.M. had left the children unsupervised with father M.S., a registered sex offender.[3]  At the same time as that discovery, concerns arose about potential sexual abuse of N.A., and she was taken for a SANE exam on October 28, 2023.  The results of the exam were inconclusive and there was not enough evidence to move forward with any kind of prosecution.  Following this event, the three children were removed and safety planned with M.A. at M.W.'s house.

{¶ 4}  On November 3, 2023, the agency filed a complaint alleging that all four children were neglected pursuant to R.C. 2151.03(B).[4]  The complaint reiterated the allegations regarding the gas station that led to the agency's involvement and described father D.A.'s status and conditions as a registered sex offender.  It further alleged that since the initial allegations, mother continued to be unable to meet the basic needs of the children and was still living with father D.A. in his car.  The agency formally requested for M.W. to have temporary custody of the children and for the agency to have protective supervision.

{¶ 5}  On December 21, 2023, a consolidated adjudication hearing was held for all four children without objection.  At the hearing, mother consented to a finding of

---

[3] *See People v. Stockman*, unpublished opinion of the Michigan 1st Circuit Court, issued April 18. 2000 (Docket No. 00-24-8725).

[4] Paternity was unconfirmed at this time so only father D.A. was listed as a father in the complaint.  Genetic testing was issued, and the identities of the fathers were corrected by the court and accepted by all involved in the matter.

3.

neglect for each child.[5]  The court heard testimony and based upon the testimony, adjudicated each child neglected.  At this hearing, the court named M.W. Temporary Custodian and mother was ordered supervised visitation with each child to be conducted individually.

{¶ 6}  On January 22, 2024, the first Guardian Ad Litem (GAL) Report was filed. In it, the GAL recommended that temporary custody remain with M.W., that the court grant protective supervision to the agency.  The GAL also recommended that mother get an assessment from the Williams County Board of Developmental Disabilities.

{¶ 7}  Shortly after, the disposition hearing was held.  M.W. remained the temporary custodian of the children and the agency was granted protective supervision. A case plan for mother was adopted which required her to find and maintain stable housing, find and maintain employment, complete parenting and budgeting classes, complete random drug screens, and attend counseling sessions. Her visitations remained supervised.  The goal at this time was reunification.

{¶ 8}  On April 25, 2024, the court held a Semi-Annual Review hearing.  At the time of the hearing, mother did not have stable housing or employment.  Furthermore, mother's counseling appointments had become sporadic, and her visitations had been

_____

[5] Mother's brief before this court states that she consented to a finding that the children were dependent and that the trial court adjudicated the children as dependent.  The transcript for this hearing has not been provided to this court, but all other records provided, including the Judgment Entry terminating mother's parental rights, reference neglect not dependency.

4.

suspended due to excessive absences and missed appointments. She had also tested positive for THC.

{¶ 9} About three months later, at the Nine-Month Review hearing, the court was advised that mother had married a new man uninvolved in the proceedings. The court also learned that mother had failed to continue therapy but that she was planning on returning to therapy at a new center. Mother continued to be transient and lacked stable employment. She had also been canceling visits with the children. At this hearing, the court additionally learned that mother had been charged with "furnishing" to a youth in the Bryan Municipal Court. See *State v. Stockman-Skala*, Bryan Muni., No. CRB-24-00265 (June 27, 2024).

{¶ 10} After nearly a full year in M.W.'s care, the agency filed a motion requesting the court to grant Legal Custody of all four children to M.W. Shortly after, the court was notified by the agency that mother and her new husband had separated and that she had moved to Detroit, Michigan with N.A.'s father, M.S. The court also learned that mother and father M.S. were related as cousins, but the degree was unknown.[6]

{¶ 11} The GAL next recommended placement of the children into the temporary custody of the agency as mother and none of the fathers had complied with the case plan. In this recommendation, the GAL commented that 1) mother was making little progress

---

[6] At the permanency hearing, mother informed the court that they were second cousins but that they did not know they were related until after she was pregnant with N.A. Mother is also related to father D.A., though according to mother, it is only by marriage and not by blood.

5.

in her case plan goals, 2) concerns remained for her stability, judgment, and protective capacity, 3) if the children were to be reunified, it would be detrimental and contrary to their best interest, 4) the children deserve to have permanency, and 5) the children deserve to have a safe environment.  The GAL noted that while M.W. loves the children, she did not believe that the arrangement with M.W. could provide the children with permanency due to concerns of M.W.'s health, the size of her home, her struggle with having all four children, and the uncertainty with her husband's immigration situation.[7] The GAL was concerned that if M.W. kept the children, while they would remain together for the time being, they would ultimately end up back in the system.

{¶ 12} The Annual Review hearing was held on November 6, 2024.  At the hearing, mother joined the agency's motion for legal custody to go to M.W.  The court denied the agency's (and Mother's) motion and a Placement hearing was scheduled for late November.  At the conclusion of the Placement hearing, the court ordered the children into the custody of the agency.  All four children were removed from the custody of M.W and placed into foster homes.[8] The permanency goal remained reunification.

---

[7] In 2023, M.W. flew to Ghana, Africa to marry a man she had met online.  The two had been dating virtually for three years before she flew to meet him and they married in that same trip.  At the time of the termination, M.W.'s husband was still in Ghana waiting on a visa interview that had not yet been scheduled.

[8] N.A. and B.R. were originally placed together while M.A. and G.A. were placed together.  N.A. and B.R. were separated after several instances of reported inappropriate touching.  M.A. and G.A. remain together at their original foster home.

6.

{¶ 13} Just a few weeks after taking custody, the agency filed the Motion for Permanent Custody requesting termination of each parent's parental rights.

{¶ 14} Between then and the permanent custody hearing held on February 24, 2025, mother filed two motions to place the children with M.W. and a motion to grant her legal custody of children. The trial court denied all three of the motions. Additionally, during that same time, the agency sought an expedited Interstate Compact on the Placement of Children (ICPC) as a relative had been located in another state. Eighty-six family members were ultimately identified by the agency. However, the agency was only able to get in contact with eight of them and could not secure family or kin placement.

## B. Permanent custody hearing

{¶ 15} On February 24 and 25, 2025, the trial court held a permanent custody hearing. The agency presented the testimony of Kerry Beck, mother's therapist; Dan Alexander, father D.A.'s parole officer (not relevant to this appeal); Zoe Maier, one of the children's supervised visitation monitors at Shalom Counseling and Mediation Services, Melinda Reynolds, the caseworker and the agency supervisor; and the current and former GALs. Mother presented the testimony of M.W. and testified on her own behalf. None of the fathers were present but were represented by counsel. Their attorneys did not present any witnesses.

### 1. Therapist's testimony

{¶ 16} Kerry Beck testified that he was mother's therapist for her individual therapy from January 2024 to December 2024. During this time, he noted that while she engaged with therapy when she attended, mother did not attend her sessions regularly—

7.

of the 25 scheduled sessions, she attended 9.  He noted that when she failed to show, she either "no showed" or would call to reschedule, usually due to illness or transportation issues.

{¶ 17} Beck testified that mother was not making progress. Furthermore, at the time of the hearing, mother did not have any therapy appointments scheduled because Shalom had discontinued her services due to her repeated missed appointments.  Beck testified that he retained mother as a client longer than the facility typically allows.

### 2. Monitor's testimony

{¶ 18} Zoe Maier testified that she was one of the monitors to observe and be present for Mother's visitations with the children.  She was assigned 14 visits between mother and the children, and of those 14, 5 occurred.[9]  Maier testified that visits were cancelled usually due to illnesses from both mother and the children.  Maier testified that the visits that did occur were one hour in length and that the interactions between mother and the children were positive.  Maier testified that the children "were always excited to come in and play" and that mother "interacted with them and there was positive engagement."

{¶ 19} Maier testified that the protocol for the supervised visitation was to implement a fee after too many missed visits.  She informed the court that the facility had implemented this fee on mother.  On cross, Maier testified that under the facility's new

---

[9] On cross, Maier noted that there were eighty-some visits scheduled at Shalom with mother.  Maier could not testify to the events of the visits not scheduled with her.

8.

rules, implemented in October 2024, after three cancellations, the facility would terminate visits and send the client back to the referral source. Maier noted that on January 27, 2025, the agency was notified of mother's non-compliance with the facility's rules.

### 3. Caseworker's testimony

{¶ 20} Melinda Reynolds testified as the caseworker and supervisor with the agency. She had been the supervisor on the cases since the cases transitioned to on-going status in November, 2023. Supervisor Reynolds had the most extensive testimony of the case and focused her testimony on the case plan.

{¶ 21} Supervisor Reynolds gave the history of mother's many living arrangements during the agency's involvement including her refusal to tell the agency where she was currently staying. Supervisor Reynolds noted that the agency could help pay rent and deposits through the PRC funding and that while mother was eligible, and had previously been receiving the funds, she declined to reapply when she moved back to the county.

{¶ 22} Supervisor Reynolds also testified to mother's extensive employment during the time of the case plan. According to Supervisor Reynolds, mother has not maintained a long-term job during the agency's involvement and had not had employment since September, 2024. Supervisor Reynolds testified that mother has not reported how she supports herself.

{¶ 23} Regarding her parenting courses, Supervisor Reynolds testified that mother had partially completed her required courses.

9.

{¶ 24} Supervisor Reynolds next testified that the case plan required monthly home visits between mother and the agency and that this requirement was not met. According to Supervisor Reynolds, the agency completed home visits in September, October, November, and December, 2023; January, February, March, April, May, June, July, August, October, and November, 2024. Home visits were attempted in August, 2023; September and December, 2024 and January, 2025. She reiterated that after September 2024 Mother did not provide a resident address for the visits to occur.

{¶ 25} Supervisor Reynolds testified that the case plan required mother to obtain a mental health assessment, which she did in January 2024. After the assessment, mother was recommended for individual counseling which she was unsuccessfully discharged from.

{¶ 26} Next, Supervisor Reynolds testified that the case plan required that the participants drug screen and have negative screens. Mother screened monthly from September 2023 to June 2024 and was negative for most substances but screened positive for THC in April 2024, October, 2024, and February, 2025. Mother failed to screen in July, September, November, and December 2024, and January, 2025.

{¶ 27} Supervisor Reynolds testified that mother had visits with the children through a supervised facility, but her last visit with any of the children was with N.A. on October 28, 2024.

{¶ 28} Regarding potential placements, Supervisor Reynolds testified that they had been looking for family placements. She noted that because of some of the parents being related, the list was shorter than a standard list with only 86 identifiable relatives between 10.

all of the parents. Supervisor Reynolds noted that after repeated attempts to get ahold of family members, she was only able to reach and talk to 8 family or kin members and none were viable options.

{¶ 29} When asked about mother's standing at the time of the hearing, Supervisor Reynolds testified that she had not completed the case plan goals and that she did not believe that mother would be an appropriate placement option for the children at the time of the hearing.

### 4. GALs' testimony

{¶ 30} There were two GALs on the case. Attorney Kylee Towne was the GAL from the inception of the case until October 28, 2024 when she left private practice. Attorney Rachel Hammersmith was then appointed GAL on that date and remained the GAL through the conclusion of the case. Both testified at the permanency hearing with the current GAL going first and the former going after.

### i. Current GAL

{¶ 31} The GAL described her involvement in the case including reviewing the previous GAL reports; visiting with the children in their former and current placements; speaking with the foster parents, M.W., intervention programs, and schools; as well as attempting to contact the fathers. The GAL additionally testified that the children were doing well in their foster care placements. G.A. and M.A. had bonded with their foster family and siblings, and she had no concerns with either of them. The GAL noted that there was one audiology appointment missed, but the foster parents were getting it rescheduled (though she could not confirm that it had actually been rescheduled), so it

11.

was not an issue to her. Turning to N.A., the GAL testified that she was doing well, though her foster mom had indicated that there were some disruptive behaviors with N.A., but that she could handle the behaviors and would not disrupt N.A. because of them. Finally, the GAL testified that B.R. was doing well at his current placement and while it was originally supposed to be a respite placement, the family intended to keep him as a placement. B.R. was attending daycare/preschool and while he still also had disruptive behaviors with inappropriate touching, his foster family was working through teaching him the difference between "good touches and bad touches."

{¶ 32} In response to a question about sibling visits, the GAL noted that N.A.'s foster mom provided daycare for B.R. and the two were able to see each other then. She did not provide any additional testimony about getting the four children together.

{¶ 33} Providing more background information on the parents to the court, the GAL testified that she did not know where mother was residing, but that mother had told her that it was not a place she could have her children at and would not be appropriate for children. The GAL had not been able to get ahold of fathers L.E. or D.A and therefore did not know where they resided. As such, she could not say that their residences would be appropriate for the children. She added that father M.S. was in prison and therefore testified that he did not have an appropriate residence.

{¶ 34} The GAL did not believe that M.W.'s home should be a permanent placement for the children, though she admitted that she did not really have any concerns with the care they were receiving from her. The GAL did, however, admit that she had some concern about the size of M.W.'s home

12.

{¶ 35} On cross, the GAL admitted that she did not find it ideal that the children were separated however, when asked about permanency regarding the current foster parents, the GAL admitted that she had not directly asked any of the foster parents about whether it was their intention to adopt the children but she did think it was a possibility for G.A. and M.A.

{¶ 36} The GAL supported the agency's motion for permanent custody and believed that the children should be made available for adoption. She believed that the children needed permanency and that those needs could not be met by a less restrictive means. The GAL stated that "[a]t this point it doesn't seem that any of the parents, [mother] nor any of the fathers are in a position nor in the position in the near future to have placement or custody of these children. The Court had denied legal custody to [M.W] and at this point I don't think that is the best option for the children so I don't see any of the options other than permanent custody." Furthermore, the GAL believed that the agency had provided reunification services to the parent.

{¶ 37} The GAL then testified to additional services she believed the children needed moving forward. For N.A. and B.R., the GAL found it "imperative" for the two to continue in counseling. She also believed that G.A. should continue with her early intervention.

13.

## ii. Former GAL

{¶ 38} The former GAL testified that she had been the GAL on the case from its inception until she withdrew at the end of October 2024 due to a job change.[10] She discussed her duties as GAL—talking to mother and father M.S. (the only one she could get ahold of), talking to M.W. and her family, home visits, reviewing records, talking with monitors at Shalom, talking to the children, and observing visitations. She noted that during her time as GAL, M.A. made the most growth, B.R.'s behaviors were calming down a bit, and that N.A. and G.A. remained true to themselves.

{¶ 39} Regarding mother, the former GAL noted that during her time as GAL, she was unable to conduct a home visit with mother. She noted that mother had struggles obtaining housing and employment and at one point was homeless. On cross, however, the former GAL admitted that she was not certain there had been any services provided by the agency to mother on these issues.

{¶ 40} Turning to M.W., the former GAL noted on cross that in her GAL reports she expressed concerns about the health of M.W. She additionally described conversations she had with M.W. where M.W. would discuss her financial concerns of having all four children in her care and her concerns with their behavioral issues. M.W. had been using respite care for the children regularly (usually her daughter and her daughter's girlfriend). Furthermore, the former GAL noted that mother was not always

---

[10] Prior GAL testified that after leaving private practice, she became the Director of the agency. She testified that at no time since becoming Director had she been involved in the case, and that she would go to lengths to avoid a conflict.

14.

supportive of the children being in M.W.'s care and that the two had gone through periods of not communicating. The former GAL believed that M.W.'s care would not be suitable long term due to these reasons as well as the size of her home and the ongoing concerns about M.W.'s marriage and her husband's immigration status.

{¶ 41} The former GAL believed that the agency's reunification plan had provided services for the parents. She stood by her recommendation that it was not in the children's best interest to stay with M.W. Additionally, she stood by her recommendation that placing the children in the custody of the agency was in their best interests.

{¶ 42} The agency rested and the case moved to mother.

### 5. M.W.'s testimony

{¶ 43} Mother called witness, M.W. M.W. described how she came to have the children and how the children ultimately were in her care for just over a year. She testified that prior to the agency's involvement in the case, a friend had sent her a Facebook post asking if someone wanted to care for a baby. After responding, mother handed a then-two-week-old M.A. over to her. M.W. testified that she thought mother would sign over her parental rights to M.A. She added that the other three came two months later when she got a call late on October 26, 2024, asking her to take the other three children. M.W. testified that her daughter and her friend went up to Michigan and collected the children. After this, all four children were placed on a safety plan with M.W.

15.

**{¶ 44}** M W. testified that once she had the children, she put B.R. and N.A. in school as well as Head Start programming. M.A. and G.A. had Help Me Grow and Head Start programming come in weekly and work with them. M.W. also testified about the children's medical care during their time with her.

**{¶ 45}** M.W. told the court that since their removal from her home, she maintained contact with them at first. She would watch N.A. for her foster mother in a "kind of a respite provider" way. M.A. and G.A. would also come over and according to M.W., they would do sibling visits at her place. M.W. testified that the visits with the children stopped in January 2025.

**{¶ 46}** When discussing her relationship with mother, M.W. confirmed the rocky start the two had when she first took the children. M.W. explained that at one point she blocked mother's number but that they have since worked through everything. M.W. did not have any contact with the fathers except father D.A., who was with mother when mother gave M.A. to M.W. At that time, father D.A. did not come into the house. However, there was one incident at a later time where he attempted to get into the house after M.W. took the other three children in. M.W. testified that during the incident, mother had asked if father D.A. could come in and see the kids and M.W. told her no because father D.A. was not allowed to be around children. M.W. testified that "I was like I'm not gonna risk losing them[.] I just got em you know and so he had tried to come in the house and that's when she ended up leaving with him."

**{¶ 47}** In discussing her journey with the foster system, M.W. testified that she did not have foster care experience, a license, or behavioral training prior to taking the

16.

children. However, after the children were removed from her care, she obtained a foster care license.  M.W. was not authorized for foster to adopt due to the circumstances surrounding her husband which do not meet the licensure requirements.  M.W. explained that he is currently still in Ghana just waiting on his visa interview.  M.W. did admit that she would consider divorcing her husband if it meant keeping the children.  She also let the court know that she had been looking into buying a new home to fit the children.

### 6. Mother's testimony

{¶ 48} Much of mother's testimony focused the case plan.  Mother testified that she had completed an assessment and parenting classes but did not complete the budgeting class assigned to her.  She admitted that she stopped going to treatment but let the court know that she had set up mental health counseling at a new agency, though the services had not started yet at the time of the hearing.  She also admitted that three drug screenings came back positive for THC.

{¶ 49} Turning to mother's goal to complete a PRC application and receive funding from the agency, mother testified that she completed an original application but then moved out of the county.  She testified that when she came back to the county, she signed up again but was denied due to lack of funds.

{¶ 50} Mother next discussed her struggles finding stable housing and employment.  She stated that she did not have a driver's license and therefore it was difficult for her to get to her scheduled sessions and maintain stable employment.  Mother testified that she had been able to repeatedly find new jobs, she just struggled to keep them due to the transportation challenges.  Mother testified that she could not remember

17.

the last time she had a job.  Regarding her housing, mother testified that CPS told her she could not get her kids until she had a house, but apartments told her she could not get a house until she had her kids.  She could not explain why she was told this.  Mother testified that she would not provide her current address to the agency because the friends whose home she was staying at did not feel comfortable with her giving the address out.  She testified that this would be temporary housing "for a while" until she could find a place.

{¶ 51} Mother testified that she was confused about whether she had completed her case plan goals.  According to her testimony, she had been told by one the agency employee that her case plan goals were completely done while another told her they were not.

{¶ 52} Regarding her personal life, mother testified about her short marriage and her intent to divorce her husband. She testified that her and father A.D. were dating though they had not been seeing each other in person.  Mother testified that she had no contact with fathers M.S. and L.E.  Furthermore, she testified that she has a theft charge in the Bryan Municipal Court that was not resolved.[11]

{¶ 53} Mother testified that she had some concerns about the children's current situations and noted that there have been issues with the current foster families taking the children to their medical appointments.  Mother requested that the children go back to

---

[11] See *State v. Skala*, Bryan Muni., CRB-25-00020.  As of September 28, 2025, the theft charge against mother has not been resolved and a bench warrant, issued April 21, 2025, is active.

18.

M.W. stating, "I['d] really like to see them at [M.W.'s] like I said but I want them to have a stable home." When asked if she could provide them a stable home, mother answered, "not right now no."

{¶ 54} Mother rested her case.

## C. Trial court's decision

{¶ 55} In its April 17, 2025 judgment entry, the trial court terminated the parents' parental rights and awarded permanent custody of the four children to the agency. In doing so, the court found by clear and convincing evidence that the children could not be placed with their parents within a reasonable time or should not be placed with their parents pursuant to R.C. 2151.414(B)(1)(a), and that it was in the best interest to award permanent custody to the agency pursuant to R.C. 2151.414(D)(1) and to terminate the parental rights of each parent.

{¶ 56} Turning first to R.C. 2151.414(B)(1)(a), the court determined that the children could not be placed with mother within a reasonable time and should not be placed with mother. The trial court looked to 1) the "ad" placed on Facebook to find someone to care for M.A., 2) giving M.A. to a stranger, 3) her transient housing and refusal to provide her address, 4) her residence with the fathers. 5) her failure to engage in counseling or follow her case plan, and the resulting discharge from treatment, 6) her lack of employment, 7) her short-lived marriage during the pendency of the case, 8) despite engaging in parenting classes, concerns about her understanding of the material and failure to complete additional classes, 9) failure to engage in visitations, 10) criminal

19.

offenses during the pendency of the case, and 11) requesting the children to be placed with M.W.

{¶ 57} In determining that the children could not or should not be placed with mother, the court made findings under R.C. 2151.414(E)(1), (4), (10), and (14).[12]

{¶ 58} As to (E)(1), the court found the condition that caused the children's removal was homelessness by mother and father A.D. and that this issue had not been remedied. The court found that there continued to be a lack of stable housing, that mother refused to provide the court with her current residence, and that she intends to remain in a relationship with A.D. The trial court concluded that mother has not shown that she can provide a safe and appropriate home for the children.

{¶ 59} As to (E)(4), the court found that mother demonstrated a lack of commitment to the children by failing to regularly visit or communicate with them when she was able to, or by other actions showing her unwillingness to provide an adequate permanent home for them. The court based this finding on mother's failure to follow the terms of the case plan, failure to establish ongoing contact with her children, failure to provide support for the children, and refusal of allowing caseworkers into any home where she is staying.

{¶ 60} As to (E)(10) the court found that mother gave M.A. away to a stranger, and upon the removal of the other children, had not seen the children since August, 2024.

---

[12] The trial court also found that the children should not be placed with fathers M.S. and D.A. under (E)(13), however, as this finding applied solely to the two fathers, this court will not analyze the finding.

20.

{¶ 61} As to (E)(14) the court found that mother did not provide shelter and other basic necessities for the children.

{¶ 62} Finally, the court determined under R.C. 2151.414(D)(1) that when reviewing the facts stated in the case, that it was in the children's best interests to award the agency permanent custody.

{¶ 63} After considering all of the evidence and making detailed findings, the trial court awarded permanent custody of the children to the agency and terminated mother's parental rights.

{¶ 64} Mother appealed and assigned the following error for our review:

I.  THE TRIAL COURT ERRORED (sic) WHEN IT GRANTED THE MOTION FOR PERMANENT CUSTODY AS IT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## II. Law and Analysis

### A. The law of permanent custody

{¶ 65} Parents have a fundamental liberty interest in the care, custody, and control of their children. *In re K.H.*, 2008-Ohio-4825, ¶ 39. However, the right to parent one's children is not absolute; it does not give a parent a right to abuse or neglect a child. *Id.* at ¶ 40. The state has broad authority to intervene to protect children from abuse and neglect. *In re C.F.*, 2007-Ohio-1104, ¶ 28, citing R.C. 2151.01. "An award of permanent custody, which terminates parental rights, is a last resort and is only justified when it is necessary for the welfare of the child." (Citation omitted.) *In re L.R.-L.*, 2023-Ohio-2071, ¶ 24 (10th Dist.). Because granting permanent custody terminates parental rights,

21.

"parents 'must be afforded every procedural and substantive protection the law allows.'"

*In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991).

{¶ 66} R.C. 2151.414 sets forth "specific findings a juvenile court must make before granting an agency's motion for permanent custody of a child." *In re A.M.*, 2020-Ohio-5102, ¶ 18, citing *In re C.F.* at ¶ 22. Under that provision, the court must first find that any of the following circumstances described in R.C. 2151.414(B)(1)(a)-(e) exists:

> (a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.
>
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a) through (e).

{¶ 67} If the court finds that R.C. 2151.414(B)(1)(a) applies, it must consider both whether any of the factors enumerated in R.C. 2151.414(E) are present that would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent *and* whether granting permanent custody to the agency is in the child's best interest.  *In re B.K.*, 2010-Ohio-3329, ¶ 42-43 (6th Dist.).

22.

**{¶ 68}** If the court finds that at least one of the factors in R.C. 2151.414(E) exists, it "shall" find that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. The court's finding that any (E) factor exists is sufficient to support an award of permanent custody to the agency. *In re S.J.*, 2024-Ohio-5137, ¶ 29 (6th Dist.); *In re Carlos R.*, 2007-Ohio-6358, ¶ 38 (6th Dist.) ("[A] court need only find one factor under R.C. 2151.414(E) to support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent ....").

**{¶ 69}** As relevant here, the court found that R.C. 2151.414(E) (1), (4), (10), and (14) were applicable to mother. The relevant sections of the statute provide:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

\* \* \*

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

\* \* \*

(10) The parent has abandoned the child.

\* \* \*

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

R.C. 2151.414(E)

{¶ 70} After finding that at least one factor in R.C. 2151.414(E) applies, the court must then determine whether awarding permanent custody to the agency is in the child's best interest by considering the factors in R.C. 2151.414(D)(1). Pursuant to R.C. 2151.414(D)(1), the juvenile court "shall consider all relevant factors, including, but not limited to, the following:"

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e).

{¶ 71} All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a

24.

termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus; *In re Alexander C.,* 2005-Ohio-6134, ¶ 37 (6th Dist.) (Clear and convincing evidence is a higher degree of proof than preponderance of the evidence, but a lower degree than beyond a reasonable doubt.).

{¶ 72} We review a trial court's determination in a permanent custody case under a manifest-weight-of-the-evidence standard. *In re P.W.*, 2012-Ohio-3556, ¶ 20 (6th Dist.); *see also In re Z.C.*, 2023-Ohio-4703, ¶ 11 ("Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, * * * the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties."). In doing so, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed. *Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. But while we review the evidence and consider the witnesses' credibility, we must be mindful that the trial court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *P.W.* at ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." (Internal quotations omitted.) *In re C.P.,* 2009-Ohio-2760, ¶ 10 (10th Dist.). If the

25.

evidence is susceptible to more than one interpretation, we are bound to interpret it in a way that is consistent with the trial court's judgment. *Z.C.* at ¶ 14, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), fn. 3.

### B. The trial court's findings are supported by the evidence.

{¶ 73} In her only assignment of error, mother argues that the trial court's findings are against the manifest weight of the evidence. In doing so, mother focuses on R.C. 2151.414(B)(1)(d) and whether the children had been in "the temporary custody of one or more public children service agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period." She argues that she still had time to work through the case plan before the agency needed to file for permanent custody. She contends that she was engaged in mental health counseling, did not have a drug problem, had completed her parenting classes, completed drug screens—only testing positive for THC, and while she did have an issue with employment and visitation, the root cause was because of her lack of a driver's license. Like at trial, mother argues that her housing issue is circular—she needs the children to get housing and needs housing to get the children. Overall, mother focuses on her belief that she completed some of her goals and was still working toward completing the case plan. She believes it would have been reasonable to allow her more time to complete these goals and that termination was drastic and against the manifest weight of the evidence.

{¶ 74} Mother makes an additional argument that there was a possibility of granting M.W. legal custody and placing the children with her. She believes that doing this would have been a less drastic measure and that the manifest weight did not support a

26.

granting of the motion for permanent custody when there was a reasonable legal custody placement available.

{¶ 75} In response, the agency argues that the trial court found R.C. 2151.414(E) (1), (4), and (14) satisfied by clear and convincing evidence and that because the trial court formed a firm belief as to all the essential elements, the trial court's decision was not against the manifest weight of the evidence.

{¶ 76} As previously mentioned, the trial court found that R.C. 2151.414(B)(1)(a) applies in this case, so it examined the R.C. 2151.414(E) factors. "[A] court need only find one factor under R.C. 2151.414(E) to support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent * * *." *In re Carlos R.*, 2007-Ohio-6358, ¶ 38 (6th Dist.).

{¶ 77} The court found that R.C. 2151.414(E) (1), (4), (10), and (14) were applicable to mother. While only one (E) factor must be met by the trial court, we will address each of those "(E) factors" and the trial court findings below.

### 1. R.C. 2151.414(E)(1)—Failure to remedy the conditions that caused the children to be placed outside of the home

{¶ 78} Here, the children were removed from mother primarily because of mother's homelessness and inability to provide for them. Therefore, those were the issues she needed to resolve for the children to be returned to her.

{¶ 79} The record shows that mother complied with some of the terms of the case plan and made some progress toward attaining her case plan goals. However, completing some of the terms of the case plan does not automatically mean a parent and child can or

27.

should be reunified; the ultimate question is whether the parent remedied the issues that caused the child to be removed from the home, *not* whether the parent did everything in the case plan. *E.H.*, 2022-Ohio-1682, at ¶ 86 (5th Dist.).

{¶ 80} The trial court found that this issue had not been remedied as there continued to be a lack of stable housing, mother refused to provide the court with her current residence, and she intended to remain in a relationship with A.D., who could not see the children as a condition of his sex offender conviction. The trial court concluded that mother has not shown that she can provide a safe and appropriate home for the children. We agree.

{¶ 81} Mother had over a year to make necessary changes, but did not sufficiently remedy any of the concerns regarding housing, stability, and care that caused the children's removal. Furthermore, mother continues to engage in behaviors that push her further from remedying the situation. As such, we cannot say that the trial court lost its way and created a manifest miscarriage of justice by determining that the children could not be placed with mother in a reasonable time, and should not be placed with mother. We therefore find that the trial court's findings regarding section (E)(1) are not against the manifest weight of the evidence.

### 2. R.C. 2151.414(E)(4)—A demonstrated lack of commitment toward the children

{¶ 82} The trial court found that mother demonstrated a lack of commitment to the children by failing to regularly visit or communicate with them when she was able to, or by other actions showing her unwillingness to provide an adequate permanent home for

28.

them. The trial court based this finding on mother's failure to follow the terms of the case plan, failure to establish on-going contact with her children, failure to provide support for the children, and refusal to allow caseworkers into any home where she is staying.

{¶ 83} Once again, mother had over a year to make the necessary changes and show a commitment to the children. As revealed in the testimony of her therapist, the monitor, and the GALs, mother often canceled visits and appointments citing transportation and illness, or would simply "no show." While mother struggles with transportation and employment, and describes her "circular" challenge obtaining housing, mother has been unwilling to provide for the children in ways within her control. Mother continues to maintain a romantic relationship with a registered sex offender who is not permitted to be around children. Furthermore, she is currently staying in a home that even she deems is not fit for children and plans on staying there "for a while" until she can acquire housing. As the GALs testified, neither were able to conduct a home visit with mother and she has been uncooperative in giving information to the agency, the court, and/or the GALs about where she is residing.

### 3. R.C. 2151.414(E)(10)—Abandonment

{¶ 84} The trial court found that mother abandoned her children. To support this finding, the trial court noted that mother gave M.A. away to a stranger, and that upon the removal of the other children, had not seen the children since August, 2024.

{¶ 85} Pursuant to R.C. 2151.011(C), "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more

29.

than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." Mother does not contest that she placed an ad for M.A. on Facebook and gave her two-week old child to a stranger, nor does she contest the findings that she has not seen her children since August 2024. This unrebutted evidence supports the trial court's determination that mother abandoned her children. As such, the trial court's findings regarding section (E)(10) are not against the manifest weight of the evidence.

### 4. R.C. 2151.414(E)(14)—Failure to provide basic necessities

{¶ 86} The trial court found that mother did not provide shelter and other basic necessities for the children. However, court did provide an explanation as to why it found that section (E)(14) was met and what evidence supported such a finding. Seeing that "a court need only find one factor under R.C. 2151.414(E) to support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent * * *." *In re Carlos R.*, 2007-Ohio-6358, ¶ 38 (6th Dist.), and this court affirms the trial court's findings as to sections (E)(1), (2), and (13), we decline to make findings of fact on this issue.

### 5. R.C. 2151(D)(1) Best interest

{¶ 87} Because the trial court found at least one factor under R.C. 2151.414(E) met, the court went on to review the best interest factors. The trial court determined under R.C. 2151.414(D)(1) that when reviewing the facts stated in the case, it was in the children's best interests to award the agency permanent custody. While not elaborating on its independent reasons, the trial court noted that it considered:

30.

all the relevant factors including the interaction and interrelationship of each child with the child's parents, siblings, relatives, and foster caregivers, and any other person who may significantly affect the child; the custodial history of each child, including whether the child has been in the temporary custody of the Agency for twelve or more months of a consecutive twenty-two month period; the children's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of Permanent Custody to the Agency; and whether any of the factors in divisions (E)(7) to (11) or ORC 2151.414 apply in relation to the parents of each child.

{¶ 88} The children have not been in mother's custody for over two years since the original safety planning on August 29, 2023. Mother does not address best interest in her argument, but she does argue that she needs more time to complete her case plan. We disagree. After two years—one with M.W. and one in foster care—the children need a legally secure placement and permanency, particularly given their young ages and interventional needs. As such, the trial court's finding that the best interest factors were satisfied was not against the manifest weight of the evidence.

**6. Mother's argument that the court should have granted legal custody to M.W.**

{¶ 89} Finally, this court briefly addresses mother's alternative argument about legal custody. In addition to her raised assignment of error about the manifest weight of the evidence regarding her termination of parental rights, mother provides a secondary argument that there was a possibility of legal custody placement with M.W.

{¶ 90} As mother references in her brief, she has moved the court several times for the children to be placed with M.W. or for M.W. to have legal custody of the children. The trial court has repeatedly denied these motions. At the permanency hearing, the trial court questioned mother's counsel about relitigating the legal custody issue that had

31.

already been denied and focusing his questions for the witnesses on placing the children with M.W. instead of focusing on the potential termination of *his client's* parental rights. Mother now argues that legal custody to M.W. would be a less drastic measure compared to the termination of her parental rights and that terminating her rights was against the manifest weight of the evidence when there was a viable alternative.

{¶ 91} Pursuant to R.C. 2151.414(A)(1), "[t]he adjudication that the child is an abused, neglected, or dependent child and any dispositional order that has been issued in the case under section 2151.353 of the Revised Code pursuant to the adjudication shall not be readjudicated at the [permanency] hearing." The awarding of legal custody is one of the potential dispositional orders under R.C. 2151.353. As such, the trial court appropriately declined to readdress the legal custody issue at the permanency hearing and in the April 17, 2025 judgment entry and correctly focused on the termination of mother's parental rights.

### III. Conclusion

{¶ 92} We have thoroughly reviewed the record of proceedings in the trial court, including the trial testimony and exhibits. We find that the trial court's decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Mother's sole assignment of error is without merit.

32.

{¶ 93} Therefore, the April 17, 2025 judgment of the Williams County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.
_____
JUDGE

Christine E. Mayle, J.

_____
Gene A. Zmuda, J.                    JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.